RCVD - USDC - CHAS, SC
2026 OCT 19 AM 11:42

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

MICHELLE ALEXANDRA RUBY,
Plaintiff,

v. Civil Action No. ____________

BRIGHTON BAY HORIZONTAL PROPERTY REGIME, also known as Brighton Bay Owners Association, Inc.; IMC RESORT SERVICES, INC.; and ALFORD LAW FIRM, LLC,
Defendants.

# COMPLAINT

**Fair Housing Act · Fair Debt Collection Practices Act · South Carolina Law**

**(Jury Trial Demanded)**

## PRELIMINARY STATEMENT

1. This is a retaliation case. Plaintiff is a disabled condominium owner. In October 2024 she spoke up at her association's annual meeting for a disabled neighbor who had been left unable to leave her building safely by repeated elevator failures. In September 2025, Plaintiff asked in writing, with a physician's note, for a reasonable accommodation for her own spinal impairment, and told the Board she would go to HUD if it refused. The Board refused. Meanwhile the storage unit recorded to Plaintiff's own home was being used by the household of the Board's President, who received her requests.

2. After Plaintiff's advocacy and requests, Defendants turned her owner account into a pressure campaign. They designated her account for collection eight weeks after confirming it was current; fined her for storing personal property in her garage parking space; locked her out of her account statements; compounded late fees on late fees until penalties nearly equaled the assessments themselves; referred her to a collection attorney; and posted roughly $10,000 of the

association's own legal fees for defending her lawsuit to her personal account, without notice and contrary to the Master Deed, its amendments, and the Bylaws. The balance they claim grew from about $2,000 to nearly $9,500 in ten months; as of March 2026, about two-thirds of what they claimed was fees and charges rather than dues. She is still locked out of her account statements and has no ledger. They will not itemize the balance, they say their own statements "should not be used or relied upon," and they will not provide the estoppel letter she needs to sell or refinance her home.

3. When Plaintiff asked for a disability accommodation for a planned elevator shutdown in September 2026, Defendants answered through their collection law firm, with a federal debt-collection notice attached to the accommodation response. The notice said the amount of the debt was stated in the letter. The letter stated no amount. Plaintiff disputed the debt in writing two days later. The firm has never answered the dispute, verified the debt, or said what amount that notice was collecting.

4. Plaintiff brings this action to stop the discrimination and retaliation, to recover her losses, and to obtain relief that will protect her and other residents with disabilities at Brighton Bay.

## NATURE OF THE ACTION, JURISDICTION AND VENUE

5. This is a civil-rights action under the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., joined with claims under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 et seq., and South Carolina law. Plaintiff, a condominium owner with a disability, sues her owners' association, its managing agent, and its collection law firm. She alleges that they refused to make a reasonable accommodation for her disability; retaliated against her because she asserted her own fair-housing rights and those of a disabled neighbor; subjected her to discriminatory terms and conditions; withheld and concealed the storage unit recorded to her home while the Board

President's household used it; and charged, demanded, and collected late fees, attorney's fees, and collection charges that the governing documents do not authorize.

6. This Court has subject-matter jurisdiction over the federal claims under 28 U.S.C. § 1331, 42 U.S.C. § 3613(a), and 15 U.S.C. § 1692k(d). It has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a), because they arise from the same facts as the federal claims and form part of the same case or controversy. It may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

7. Venue is proper in this District and Division under 28 U.S.C. § 1391(b), because Defendants reside, are found, or transact their affairs here, the dwelling is located in Beaufort County, South Carolina, and the events giving rise to these claims occurred here.

8. The Fair Housing Act claims are timely under 42 U.S.C. § 3613(a)(1). They are brought within two years after the occurrence or termination of each discriminatory housing practice alleged, excluding the time during which Plaintiff's administrative complaint has been pending. Several of the practices alleged are continuing.

9. On March 16, 2026, Plaintiff filed an administrative fair-housing complaint with the U.S. Department of Housing and Urban Development and the South Carolina Human Affairs Commission (HUD No. 04-26-9840-8; SCHAC No. H-3-26-006). No conciliation agreement has been entered, and no administrative hearing has commenced. 42 U.S.C. § 3613(a)(2)–(3).

10. The Fair Debt Collection Practices Act claims are brought within one year of each violation alleged. 15 U.S.C. § 1692k(d). The state-law claims are brought within three years of the time Plaintiff knew or should have known of each claim, S.C. Code Ann. §§ 15-3-530 and 39-5-150. Plaintiff did not learn that Storage Unit 7-10 was assigned to her home until May 5, 2026.

11. Plaintiff has a separate action pending against the Association and IMC in the Court of Common Pleas for Beaufort County, No. 2025-CP-07-02549, in which claims for breach of fiduciary duty and negligence remain pending. This Complaint does not reassert those claims. That action asserts no claim under the Fair Housing Act, or the Fair Debt Collection Practices Act, and pleads no claim concerning Storage Unit 7-10, although Plaintiff's discovery responses there describe storage-related and fee-related losses. Plaintiff seeks no double recovery, and will not seek the same damages in both actions. Plaintiff does not ask this Court to enter judgment on the amount of any assessment she owes or to set the balance of her assessment account. She seeks damages for charges Defendants imposed, demanded, and collected in violation of federal law, state law, and the governing documents; declaratory and injunctive relief against the practices alleged; and relief for the discrimination, retaliation, and loss of her storage unit.

## FACTS

### The parties and the dwelling

12. Plaintiff Michelle Alexandra Ruby owns and lives in Unit 724, a third-floor condominium in the 700 Building at Brighton Bay, 80 Paddle Boat Lane, Hilton Head Island, South Carolina. She bought Unit 724 in June 2023 by deed recorded in the Beaufort County Register of Deeds at Book 4250, Page 585. She owns Unit 724 as her home, for personal, family, and household purposes.

13. Defendant Brighton Bay Horizontal Property Regime ("the Association"), also known as Brighton Bay Owners Association, Inc., is the owners' association that governs the Brighton Bay horizontal property regime, which was established by the Master Deed Establishing Brighton Bay Horizontal Property Regime, recorded November 21, 2002 in the Beaufort County Register of Deeds at Record Book 1668, Page 387. The Association adopts and enforces the community's rules, including its restrictions on storing personal property in garages, parking

areas, and common elements, imposes fines for violations, levies and collects assessments, controls the common elements, keeps the records of limited common elements assigned to each unit, and decides residents' requests for exceptions to its rules. The Association identifies itself as "Brighton Bay, HPR" in its notices and is sued and defends in the state action as "Brighton Bay Horizontal Property Regime, Inc." Its counsel has also written that he "represents Brighton Bay Owners Association," a nonprofit corporation. In a memorandum filed in the state action on February 6, 2026, Defendants stated that "Brighton Bay was formed as a Non-Profit Corporation in 2002" and attached as its Articles of Incorporation those of Brighton Bay Owners Association, Inc., filed with the South Carolina Secretary of State on August 12, 2002. Plaintiff names the Association by both designations so that the entity that governs Brighton Bay is before the Court under its correct name.

14. Defendant IMC Resort Services, Inc. ("IMC") is the Association's managing agent. Through its community manager, Andrew ("A.J.") Bucko, IMC inspects the property, issues violation notices and fines, receives residents' requests, sends them to the Association's Board of Directors, and communicates the Board's decisions to residents. Through its accounts-receivable staff, including Ana Beltran and Christine Phillips, and its Chief Financial Officer, Garrett Hamilton, IMC maintains owners' accounts, posts assessments, late fees, interest, and other charges, issues account statements, applies owners' payments, and operates the online owner portal through which owners view statements and pay assessments.

15. Defendant Alford Law Firm, LLC ("the Firm") is a South Carolina law firm with its office at P.O. Drawer 8008, Hilton Head Island, South Carolina 29938. Its attorney Gregory M. Alford represents the Association and IMC. The Firm regularly collects or attempts to collect debts owed to others, including assessments claimed by owners' associations, and its

correspondence states: "This firm collects debts for mortgage lenders and other creditors." The Firm is a "debt collector" under 15 U.S.C. § 1692a(6).

16. At all relevant times, Jeff Prekop was President of the Association's Board of Directors and Holly Golden was its Treasurer. Jennifer Prekop is Jeff Prekop's wife.

**Plaintiff's disability and Defendants' knowledge of it**

17. Since January 2024, Plaintiff has had a spinal impairment that substantially limits her ability to lift, bend, twist, carry, and perform manual tasks, including lifting and moving heavy or bulky objects. The impairment is ongoing. On August 21, 2025, Plaintiff's treating spine specialist documented her restrictions in writing.

18. Plaintiff is a person with a handicap within the meaning of 42 U.S.C. § 3602(h).

19. Plaintiff's impairment began in January 2024, when she slipped and fell on wet common-area stairs at Brighton Bay. She reported the fall to Board President Prekop, and anti-skid treads were installed on those stairs shortly afterward.

20. Defendants knew of Plaintiff's condition long before August 2025. Throughout 2024 and 2025, Jennifer Prekop corresponded with Plaintiff about her back condition. Ms. Prekop repeatedly asked about Plaintiff's back and her medical appointments, and knew of her impaired mobility, her treatment, and her continuing pain. In August 2025, Plaintiff told Ms. Prekop that her back "ha[d] gotten really bad."

21. Jeff and Jennifer Prekop knew of Plaintiff's back condition, and that it kept her from lifting or moving her personal property, long before the August 2025 fine. Plaintiff's dog attended daycare at the Prekops' dog-grooming and daycare business. From early 2024 through 2025, during those visits, Plaintiff repeatedly discussed her back condition and resulting physical limitations with both of them, including that she needed help caring for her dog and could not lift or move the personal property at issue. In February 2024 Plaintiff also wrote to Jennifer Prekop

that her back was "killing me" and that she would "see how mobile I am." On July 21, 2024, Plaintiff told Ms. Prekop in writing that she had put her personal property in front of her car temporarily because she needed to find a place to store it; Ms. Prekop replied, "It's all good," and later suggested places on the property where it might be kept. On September 4, 2025, after the fine and the same day Plaintiff submitted her written accommodation request (¶25), Plaintiff wrote to Ms. Prekop: "My doctors says I can't touch it so they either need to get one or let me keep it where it is." Ms. Prekop answered, "To me it looks fine where it is now." When Plaintiff asked the Prekops about storage, they told her none was available, while their own household was occupying the storage unit recorded to, and permanently attached to, Plaintiff's home (¶¶79–80).

**Plaintiff's protected activity**

22. This case is about what Defendants did to Plaintiff after she spoke up for the rights of residents with disabilities, including her own.

23. At the Association's October 24, 2024 annual meeting, attended by the Board and by IMC's community manager Mr. Bucko, Plaintiff spoke in support of a disabled resident of the 800 Building who relies on the elevator. That resident had experienced repeated elevator failures that left her unable to leave her building safely. Plaintiff asked the Association to address the failures and the resident's access and safe exit. At the same meeting, Plaintiff raised the need for a storage rack for her personal property; Mr. Bucko said it was not feasible.

24. Plaintiff continued this advocacy in writing. On October 1, 2025, she wrote to the Board, with copies to Board President Prekop, Treasurer Golden, and IMC. She reported that the disabled resident had documented at least eight elevator failures in the past year with no meaningful corrective action. She stated that the failure to act "constitutes discriminatory treatment of residents with disabilities" and that "[f]ederal law requires reasonable

accommodation and equal access." She asked that "ADA accommodations" be placed on the annual meeting agenda.

25. On September 4, 2025, Plaintiff wrote to Treasurer Golden, Board President Prekop, Mr. Bucko, and the Association's counsel. She attached a doctor's note, stated that she has "a medical condition and physical limitation which prevents me from lifting, moving, or bending ...," and respectfully requested that storage racks be installed as soon as possible "so that my condition is not used as a basis for further fines and provides access to a reasonable accomodation [sic]." In the same letter she told Defendants that the $25 fines were not being applied evenly to all residents.

26. On September 4, 2025, Mr. Bucko forwarded Plaintiff's request to the full Board. Treasurer Golden acknowledged it, declined Plaintiff's request to attend the September 5 Board planning session, and stated that a fuller response would follow.

27. The official minutes of the Board's September 5, 2025 planning session record no consideration of, discussion of, or vote on Plaintiff's accommodation request. At that same session the Board approved the use of other residents' registered golf carts.

28. On September 26, 2025, having received no substantive response, Plaintiff wrote again to Treasurer Golden, with copies to Mr. Bucko and Board President Prekop: "I have a documented medical condition that limits my ability to lift, bend, or move equipment. I am requesting a reasonable accommodation under the Americans with Disabilities Act (ADA)," in the form of timely installation of racks or other storage solutions, "to avoid discriminatory treatment or unfair fines." Although Plaintiff's correspondence referred to the ADA, the accommodation she requested is one the Fair Housing Act requires a housing provider to make, 42 U.S.C. § 3604(f)(3)(B), and her claims here arise under that Act.

29. In the same letter, Plaintiff advised that if the matter was not resolved she would file a formal ADA and Fair Housing discrimination complaint with the U.S. Department of Housing and Urban Development. Defendants' October 1, 2025 response, written into Plaintiff's email, answered her other requests but did not address her statement that she would file a fair-housing complaint with HUD.

30. On March 16, 2026, Plaintiff filed a fair-housing complaint with HUD and the South Carolina Human Affairs Commission against the Association, IMC, and Mr. Bucko, alleging disability and sex discrimination, denial of reasonable accommodation, and retaliation. On information and belief, Defendants were served with notice of the complaint within ten days of its filing, as 42 U.S.C. § 3610(a)(1)(B)(ii) requires. In any event, they knew of it no later than May 26, 2026, when Plaintiff referred to the "active HUD/SCHAC fair housing matter" in an email to Mr. Bucko, Board President Prekop, Treasurer Golden, and the Association's counsel.

31. Plaintiff engaged in activity protected by the Fair Housing Act on at least the following occasions, each known to Defendants:

(a) October 24, 2024: advocating at the annual meeting for a disabled neighbor's access to her home (¶23);

(b) September 4 and 26, 2025: requesting reasonable accommodations for her own disability, with a physician's note (¶¶25–28);

(c) September 26, 2025: telling Defendants she would file a fair-housing complaint with HUD;

(d) October 1, 2025: writing to the Board that its failure to address elevator outages "constitutes discriminatory treatment of residents with disabilities" (¶24);

(e) March 16, 2026: filing a fair-housing complaint with HUD and SCHAC (¶30); and

(f) September 3, 2026: requesting an accommodation for the planned elevator shutdown (¶72).

**Retaliation in 2025: collection status, selective enforcement, and refusal**

32. Plaintiff owned a recreational kayak. She placed it in front of her car in her assigned garage parking space while she looked for somewhere to store it. It remained there, without any enforcement action, until August 2025.

33. On July 24, 2024, the Board, then including President Jeff Prekop and Treasurer Holly Golden, sent owners a memo stating that storage of items in the #700, #800, and #1400 building garages "is not permitted," that only bicycles were allowed, "no exceptions," and that items must be removed "by end of the day on 7/31/2024 or fines will be applicable." Defendants imposed no fine on Plaintiff's kayak, which remained in her garage space, for more than a year after that deadline, until after her October 24, 2024 advocacy.

34. After Plaintiff's October 2024 advocacy, and despite the Board President's knowledge that her back condition kept her from moving the kayak (¶21), Defendants began enforcing the garage rule against her. On August 19, 2025, Mr. Bucko fined Plaintiff $25 for the kayak. The Association's recorded Schedule of Fines (revised January 11, 2023; recorded February 12, 2024 at Book 4309, Pages 2244–2245) calls for a "Notice" for a first garage or storage offense (Rules P and B.7) and a $25 fine only for a second. Plaintiff had no prior offense and never received an individual notice; Defendants' only communications were "Broadcast Message" emails to all owners on July 29 and August 11, 2025, the second addressed "Good Afternoon Owners." Defendants treated that mass email as Plaintiff's first-offense notice. On information and belief, Plaintiff was the only resident fined, although she had told Mr. Bucko on August 15, 2025 that

"there are at least 8 of us" who wanted a kayak rack. Asked whether anyone else had been cited, Defendants said only that violators had been "warned and/or fined accordingly."

35. Other residents kept surfboards, paddleboards, and golf carts in comparable locations, including parking spaces and balconies, some connected to extension cords, without receiving violations or fines. The Association's recorded Rules of Conduct expressly prohibit storing "surf boards" and other large items on balconies (Rule B.2). When Plaintiff reported a golf cart being charged by an extension cord hanging from a balcony, the Association's response was that "[t]he golf cart itself is legal" and that management would "contact the owner about removing the extension chord [sic]." On information and belief, that owner was not fined.

36. After the fine was imposed, Plaintiff asked Jennifer Prekop, the wife of Board President Jeff Prekop, why Plaintiff had been fined when residents with comparable equipment had not. Ms. Prekop answered that the enforcement action against her was taken "to make a point."

37. The Association's written Cabana Policies require an owner to reserve the cabana at least 24 hours in advance, pay a $100 deposit, and sign a reservation form witnessed by management. In May 2026, Mr. Bucko wrote that Treasurer Holly Golden "has been using the cabana periodically when it isn't booked," without reference to any of those requirements. Defendants enforced their rules strictly against Plaintiff while excusing a Board officer from theirs.

38. Defendants also refused to let Plaintiff present her request to the Board. On August 16, 2025, Mr. Bucko told Plaintiff that "[t]he Board will discuss this topic at their annual planning session on 9/5." When she asked on August 20 to attend that session, he replied: "The planning meeting is not open to owners. The Board has a lot of topics to discuss. You can bring

these topics up at the annual meeting." On September 4, 2025, when Plaintiff renewed her request to attend with her physician's note, Treasurer Golden refused again. Yet Defendants heard other owners directly. On October 1, 2025, Defendants wrote that "[t]he Board met with members of the 1400 building to discuss the implementation of shrubs and a fence over there." The Board's May 20, 2026 minutes record that another owner, Pete Barbadoro of Unit 806, attended a Board meeting and addressed the directors about a parking-garage incident. Plaintiff also recalls an announcement at an earlier annual meeting that owners could ask to attend Board meetings. Defendants then barred Plaintiff from the very annual meeting to which they had directed her unless she surrendered her proxy (¶48).

39. In late September 2025, before Defendants gave Plaintiff any written answer, Jennifer Prekop told Plaintiff during a dog-daycare pickup that the Board had decided against installing a kayak rack.

40. On October 1, 2025, Defendants responded in writing through Mr. Bucko: "The Board decided against installing a kayak rack. The Board is going to bring this topic up for further discussion under New Business at this year's annual meeting."

41. Defendants' October 1 response did not offer any "other storage solution," suspension of fines, or any other alternative. Defendants did not ask Plaintiff for any information about her limitations, did not offer to meet with her, and did not respond to her request that her condition not lead to further fines.

42. When Defendants refused Plaintiff's requests, an effective accommodation was already available at no cost to the Association: Storage Unit 7-10, the approximately 43-square-foot storage unit recorded to, and permanently attached to, Plaintiff's own home (¶¶78–80). Board President Prekop received Plaintiff's September 4 and September 26 requests while his

household occupied that unit. Plaintiff's kayak, a Pelican Brume 100XP, was 10 feet long and 28 inches wide. Storage Unit 7-10 measures 5 feet 9 inches by 7 feet 4 inches, with a ceiling height of 8 feet 3 inches. Leaning against the storage unit's longer wall, the kayak would have reached the ceiling with its base about 5 feet 8 inches from the wall, well within the unit's 7-foot-4-inch length.

43. Because Defendants fined her, refused any storage solution, and continued to treat the kayak as a violation, Plaintiff disposed of it.

44. Plaintiff gave Defendants her physician's note documenting her lifting restrictions. Defendants nonetheless refused to rescind the fine. They kept it on her account, cited it in the October 6, 2025 "Pre-Legal" collection notice (¶46), and charged late fees and interest on it.

45. On October 1, 2025, Defendants refused Plaintiff's accommodation request (¶40). The same day, Plaintiff sent the Board her written disability-access letter (¶24).

46. Five days later, on October 6, 2025, IMC accounts-receivable employee Ana Beltran informed Plaintiff that her account's late fees were in "Pre-Legal" status, that "the next step will be legal action," and that a garage-violation fine (the kayak fine) was outstanding. No one had explained any collection status to her before. On May 4, 2025, Plaintiff had disputed the late fees in writing, telling IMC: "I'm not paying the late fees as that was an issue with the outdated website's login and payment portal," and IMC's accounts-receivable department confirmed that day that her account was "current." Eight weeks later, on or about June 30, 2025, and eight months after her October 24, 2024 advocacy for her disabled neighbor (¶23), Defendants designated her account "Pre-Legal." The label appeared only as a memo on account statements she could not view or verify through the portal because she was locked out, and the monthly late-fee charges on her account nearly quadrupled the next month. From May through August 2025,

Plaintiff's bank confirmed her monthly automatic payments of $415. Because Plaintiff could not log in to the owner portal, she could not see her account statements or change the bank account on file; and IMC told her it could not view her banking information.

47. The October 6 notice came ten days after Plaintiff told Defendants she would file a fair-housing complaint with HUD, and eleven days before she filed her state lawsuit.

48. On information and belief, at the Association's annual meeting on October 23, 2025, the Board stated that it had reviewed Plaintiff's request and denied it. Defendants barred Plaintiff from attending that meeting unless she gave them her proxy. Plaintiff declined to surrender her vote. Defendants then neither allowed her to attend by Zoom nor sent her instructions to attend electronically, while other owners, including owner Jason Peacock, received the Zoom access instructions, as Mr. Peacock told Plaintiff. On November 3, 2025, the Association's counsel confirmed that she "[was] not sent the access instructions because Association records indicate you did not return a valid proxy." Defendants thus conditioned Plaintiff's participation in her own association's annual meeting on surrendering her vote. In March 2026, Plaintiff stated in writing that she had requested a Zoom link as an accommodation because her back condition kept her from sitting for long periods.

**Retaliation continues: threats, direct collection, and pressure to drop her claims**

49. On October 17, 2025, the Association's counsel refused Plaintiff's request for the Association's "ADA/Fair Housing correspondence" and warned that the Association would seek "all remedies available under South Carolina law, including recovery of costs and attorneys' fees." He directed that all further communication go through him.

50. Defendants also limited Plaintiff's access to information. On August 20, 2025, when she asked for contact information for the Association's attorney and CPA, IMC told her to send her questions to it instead because "I cannot have owners contacting these individuals," after she

noted she had asked for the same information at the 2024 annual meeting and never received it. On October 1, 2025, Defendants told her that the May 2025 minutes were "still in draft form." In February 2026, the ledger Defendants forwarded to her covered only January through May 2025.

51. On November 19, 2025, after the Association's counsel had directed in his October 17, 2025 letter that all correspondence go through him, IMC's accounts-receivable employee wrote to Plaintiff directly about a "large past due balance of $2,085.79" and warned of "additional late fees and potential collection activity." Plaintiff had told IMC on November 17, 2025 that she would place future payments in escrow if the account was not corrected. By December 2, 2025, the balance shown was $2,500.79.

52. On December 23, 2025, after Plaintiff told the Association's counsel that she had made a claim under the Association's directors-and-officers insurance policy, he wrote: "We do not believe that you have standing to file a claim on someone else's policy. … Please dismiss your suits immediately."

**Retaliation in 2026: attorney referral, the $10,000 posting, and threats to her home**

53. On information and belief, on January 23, 2026, the Board voted on lien and foreclosure action against four other owners' delinquent accounts. It took no vote concerning Plaintiff's account.

54. Three days later, on January 26, 2026, Defendants referred Plaintiff's account to an attorney ("turn acct over to atty") and charged a $42 collection-administration fee. They classified the account as "with attorney" on January 30, 2026, and posted further late-fee charges of $305.58 and $53.08 that day. On February 6, 2026, the same day IMC's accounts-receivable manager signed a notarized affidavit against Plaintiff in the state action, they added a $58 notary fee to Plaintiff's account.

55. In February 2026, approximately $10,000 of the Association's own attorney's fees for defending against Plaintiff was posted to Plaintiff's individual owner account. At the court-ordered reconciliation meeting, IMC's Chief Financial Officer, Garrett Hamilton, stated that he had made the posting and that the $10,000 represented the Association's attorney's fees. Nothing in the Master Deed, its amendments, or the Bylaws provides for this posting.

56. On March 2, 2026, the Association's counsel confirmed Mr. Hamilton's admission in writing, stating that the $10,000 charge "was placed on your account to reflect attorneys' fees expended on this matter by the Association."

57. Plaintiff's account showed the charge on February 10, 2026, the day of summary-judgment hearings in the state action, and still showed it on February 11, 2026. It was removed afterward. Defendants' March 2, 2026 statement shows neither the posting nor its reversal.

58. The governing documents do not authorize this charge. They allow the Association to recover attorney's fees from an owner only as "expenses of collection" of that owner's unpaid assessments or charges. Bylaws Art. VII, § 4, as amended by the Second Amendment to the Master Deed (Book 2622, Page 1414). They also provide that "[i]n the event any litigation is instituted, then the Association shall [assess] all Owners for the costs of litigation, including ... attorney's fees incurred, and funds from regular assessments shall not be used for any such claim or litigation." Bylaws Art. VII, § 15. The $10,000 was the Association's cost of defending Plaintiff's lawsuit, not a cost of collecting any assessment.

59. The posting nearly tripled the balance Defendants claimed Plaintiff owed. It exposed her home to lien and foreclosure, and was carried out by the managing agent's chief financial officer four months after the Association's counsel threatened to seek attorney's fees from her.

60. Defendants' collection referral, attorney's-fee posting, and escalating charges carried the threat of lien and foreclosure of Plaintiff's home. That threat was a basis for Plaintiff's first motion in the state action under Rule 67, SCRCP, to deposit her assessments with the Clerk of Court rather than pay them into an account she could not see.

61. Defendants' representatives referred to lien and foreclosure remedies at the February 2026 reconciliation meeting. Plaintiff filed her Rule 67 motion on February 23, 2026. At the hearing on it on May 6, 2026, the Association's counsel told the court that the Association had a duty to pursue lien and foreclosure. By order filed May 21, 2026, the court granted Plaintiff leave to deposit $1,641.85, without prejudice to any party's position, and Plaintiff deposited that amount with the Clerk on May 22, 2026 to protect her home.

**Exclusion from her own account**

62. Plaintiff's problems with IMC's portal began soon after she bought her unit. On October 31, 2023 she told IMC she "cannot login to the payment portal." That month IMC's accounts-receivable staff explained that the system "will automatically charge a late fee" if payment is not received by the 30th, and waived a late fee caused by payment-processing time. In February 2024, the portal's payment field "kept auto filling" an incorrect amount. In June 2024 the portal froze at "Continue to Payment"; IMC charged late fees anyway and did not grant her July 17, 2024 request to waive them. In April 2025 she wrote: "I can't log in and there is auto payment that is using the wrong bank account!" These problems began before Plaintiff's protected activity. What changed after it was Defendants' response to them: collection status, attorney referral, and escalating charges.

63. The Association requires owners to view their accounts and pay assessments through IMC's online owner portal.

64. Plaintiff repeatedly asked IMC in writing to restore her access to the portal and to correct her payment information. Defendants did not restore her access, and kept charging late fees and penalties to the account she could neither see nor pay through.

65. Defendants have conceded the lockout in writing. On February 17, 2026, the Association's counsel wrote to Plaintiff, with copies to Mr. Bucko, Board President Prekop, and IMC's Chief Financial Officer: "You are correct about the Portal, apologies." At the reconciliation meeting ordered by the state court, held at IMC's office on February 12, 2026, IMC's accounts-receivable manager, Christine Phillips, acknowledged that Plaintiff was locked out of the owner portal. Six days earlier, Ms. Phillips had signed a sworn affidavit against Plaintiff in the state action stating a balance on the account Plaintiff could not see (¶54).

66. Plaintiff remains locked out. She cannot view her account statements or account history through the owner portal; the "My Statement" function is greyed out and inaccessible. She has repeatedly told Defendants in writing, including after March 16, 2026, that she remains unable to view her statements and account history, and has asked them to restore her access. Defendants have not done so. Plaintiff asked Defendants' counsel in writing for a full itemized account history on April 2, 2026, and for a complete owner ledger on May 18, 2026; on May 1, 2026, she identified "payment portal access restrictions" among the subjects for deposition. Since March 2, 2026, Defendants have provided neither an updated ledger nor access. As of the filing of this Complaint, Plaintiff is still locked out of her account statements, cannot see her account ledger, and Defendants refuse to provide one.

67. While Plaintiff was locked out, Defendants kept adding late fees. By March 19, 2026, Defendants' own aged-receivables report showed $1,982.31 in late fees against $2,153.00 in association fees: penalties nearly equal to the underlying assessments.

**After the HUD complaint: inflated balances, refusal of records, and an estoppel letter withheld**

68. After receiving notice of the HUD complaint (¶30), Defendants kept Plaintiff locked out of the owner portal and continued adding late fees and charges. On March 23, 2026, Defendants demanded $5,257.33, including $1,982.31 in late fees, a $42 collection-administration charge, and a $58 notary charge. By September 2, 2026, Defendants' statement claimed a balance of $9,497.80. Defendants have refused Plaintiff's repeated requests to itemize this balance, including her requests of April 2, May 18, and September 18, 2026, and have provided no estoppel letter (¶69).

69. On May 18, 2026, Plaintiff asked Defendants' counsel in writing for an estoppel letter and a complete owner ledger for Unit 724, explaining that she was evaluating sale and refinance options, which she had discussed with a real-estate agent, and asked whether any lien, notice of lien, or lis pendens had been filed. An estoppel letter states the amounts an association claims against a unit and is required to close a sale or refinancing. Defendants never responded. Without an estoppel letter, and with an unexplained balance that Defendants say should not be relied upon, Plaintiff's ability to sell or refinance Unit 724 has been impaired. Defendants' counsel has confirmed in writing that the statements' disclaimer is meant "to advise closing attorneys." Without an estoppel letter and a reliable balance, Plaintiff cannot close a sale of her home.

70. On October 14, 2026, Plaintiff proposed to Defendants' counsel a stipulated order allowing her to deposit the remaining regular assessments for June through October 2026 ($2,205) and later months with the Clerk. Counsel did not respond by the requested date. Plaintiff is therefore filing in the state action, on the same day as this Complaint, a second Rule 67 motion for leave to deposit those assessments.

71. Since May 26, 2026, apart from the September 16, 2026 letter and correspondence about discovery in the state action, Defendants have not responded to Plaintiff's written requests. They have not answered her May 18 estoppel and lien inquiry, her September 18 dispute, her September 18 request for more time to provide verification for her elevator accommodation, her October 6 request that they preserve the records of accommodation requests and elevator complaints, or her October 14 proposal to deposit her assessments with the court.

**The elevator accommodation answered with a debt-collection notice**

72. On September 3, 2026, Plaintiff requested an accommodation for the planned elevator outage, asking Defendants to provide temporary lodging, help with access, or another workable solution for the period she could not use the stairs. Defendants answered on September 16, 2026 through their litigation counsel. They attached a debt-collection notice to the accommodation response, and the cover email raised Plaintiff's alleged nonpayment and proposed adding claims against her for dues. The notice stated, "We are attempting to collect a Debt," and that the amount and description of the debt were in "the letter to which this notice is attached." That letter concerned only Plaintiff's elevator accommodation request and described no debt. The letter did not decide the request; it asked Plaintiff for verification and offered a meeting. But Defendants attached a debt-collection notice to their response to a disability-accommodation request, while the cover email raised the dues they claimed. Joining the two linked Plaintiff's accommodation request to the debt Defendants claimed, used the accommodation process as a collection opportunity, and, as Plaintiff reasonably understood it, signaled that her accommodation would be handled together with, and subject to, that alleged debt.

73. The September 16, 2026 letter stated that Plaintiff's impairment was "not known" to the Association, although Plaintiff had given the Board President, the Treasurer, IMC, and counsel her physician's note a year earlier (¶25). The letter itself was sent with unfinished

drafting instructions still in its text, including "[date - suggest fourteen (14) days ...]" and "select and complete."

74. On April 7, 2026, IMC told residents that each elevator would be out of service for up to four weeks and that residents "who can not navigate the stairs" should "consider traveling at this time or staying with friends."

75. On October 16, 2026, the Association and IMC announced to all residents, in a broadcast signed by Mr. Bucko, that the elevator work would be postponed to the first week of January 2027 because an earlier start "would create an unnecessary hardship for residents," and told residents needing assistance to "reach out to AJ or consider coordinating with your neighbors." Defendants have made no individualized decision on Plaintiff's September 3, 2026 request.

**The pattern**

76. Much of the balance Defendants claim consists of fees and charges, not assessments. By Plaintiff's computation from Defendants' own records, total assessments through early 2026 were approximately $15,457 and her payments approximately $13,839, leaving unpaid principal of approximately $1,618, against the $4,837.50 Defendants then claimed. About two-thirds of that claimed balance, approximately $3,220, was fees and charges rather than unpaid assessments. Defendants' own report shows late fees nearly equal to the assessments themselves (¶67). Plaintiff deposited her assessments through May 2026 with the state court under its order, and is asking that court for leave to deposit the later assessments (¶¶61–70); she is not refusing to pay the undisputed assessments. Since March 2026 the balance has risen each month by more than the $441 regular assessment, reaching $9,497.80 by September 2026 (¶100), while Plaintiff was locked out of her statements, denied a ledger and an estoppel letter, and pursuing her accommodation requests, her HUD complaint, and this dispute. Defendants inflated the balance

through the practices alleged in ¶¶54–55 and 93–98, to pressure Plaintiff, and used the inflated balance to threaten referral, lien, and foreclosure. That inflation is itself retaliation and interference under 42 U.S.C. § 3617.

77. Before Plaintiff's October 24, 2024 advocacy for a disabled neighbor, Defendants had not enforced the storage rules against her kayak, even after the Board's own July 31, 2024 "no exceptions" deadline (¶33), and her account had not been designated for collection. After that advocacy, Defendants designated her account "Pre-Legal" (June 30, 2025) and fined her (August 19, 2025). After her own accommodation requests (September 2025), they refused the accommodation, kept the fine, and threatened collection (October 2025). While this litigation was pending, they referred her account to an attorney, on information and belief without any Board vote, added collection charges, and posted their own attorney's fees to her account; and after her HUD complaint, they kept her locked out of the portal's account statements while charging her late fees. The Board President's wife told her the enforcement was "to make a point." Defendants did not treat other residents this way.

**The storage unit recorded to Plaintiff's home**

78. Section 7.02(c) of the Master Deed (Book 1668, Page 387) provides that once a storage unit is assigned, it is "permanently attached" to the purchaser's unit as a limited common element. The First Amendment to the Master Deed, recorded August 19, 2003 at Book 1821, Page 1650, assigns Storage Unit 7-10 to Unit 724 and provides that assigned storage units "may not hereafter be sold separately from the respective corresponding Unit." Under the Master Deed, Storage Unit 7-10 passes with Unit 724 to each successive owner, including Plaintiff. The First Amendment assigns no storage unit to Unit 723, the Prekops' unit.

79. Defendants never told Plaintiff that Unit 724 had an assigned storage unit. On several occasions in 2024 and 2025, Plaintiff asked Board President Jeff Prekop and Jennifer Prekop

whether any owner would lease her a storage unit so she could move her kayak. Each time they told her that none was available, and suggested she ask other owners to let her use their garages. In July 2024, Plaintiff told Jennifer Prekop in writing that she needed somewhere to store her kayak, and Ms. Prekop suggested other places around the property where kayaks might be kept.

80. For years before and during the events described above, the household of Board President Jeff Prekop occupied and used Storage Unit 7-10. Defendants took no enforcement action, issued no notice, and imposed no fine for that improper occupation.

81. Plaintiff paid for off-site commercial storage at Public Storage from July 2023 through March 2025, at a cost of $1,439.07, and traveled back and forth to that facility. After she was told no storage was available, she kept paying for it. Plaintiff seeks those costs under her state-law claims concerning the storage unit (Counts IX through XII), not as damages caused by the 2025 refusal of her accommodation request.

82. On May 5, 2026, after reviewing the recorded First Amendment herself, Plaintiff wrote to the Association's counsel that Storage Unit 7-10 was permanently assigned to Unit 724, that she had never been told so, and that she had been paying for off-site storage since moving in.

83. Within hours, Jennifer Prekop came to Plaintiff's door. Ms. Prekop told Plaintiff, "I know you need storage," and agreed to vacate the unit and leave Plaintiff the key. Within days, the Prekop household vacated the unit and Plaintiff received the key. Ms. Prekop said her household had acquired the unit around 2002 or 2003 but had no paperwork for it. The exchange was recorded by Plaintiff's doorbell camera.

84. Defendants thus could have accommodated Plaintiff at any time. Once Plaintiff identified the unit herself, it was turned over to her within days, at no cost to the Association.

### Injury

85. As a result of Defendants' refusal, Plaintiff was denied an equal opportunity to use and enjoy her dwelling and its associated storage from October 1, 2025 until she recovered Storage Unit 7-10 in May 2026. She was subjected to a continuing fine and collection threats tied to the kayak, was forced to dispose of the kayak (¶43), had to pay a locksmith and arrange and pay for help moving property she could not lift, and suffered physical strain, emotional distress, humiliation, and anxiety.

## ADDITIONAL FACTS: DISCRIMINATORY TERMS, CONDITIONS AND PRIVILEGES

86. As alleged in ¶20, members of the Board knew of Plaintiff's spinal condition long before the August 19, 2025 fine (¶34).

87. Defendants fined Plaintiff for keeping a kayak she could not lift or move because of her disability. They did not fine residents who, on information and belief, have no disabilities and who kept surfboards, paddleboards, and golf carts in comparable locations (¶35).

88. While Defendants told Plaintiff no storage was available and refused her any storage solution, they allowed the household of the Board President to occupy the storage unit recorded to Plaintiff's home (¶¶42, 78–80).

89. The wife of the Board President told Plaintiff that the enforcement against her was taken "to make a point" (¶36).

## ADDITIONAL FACTS: CHARGES, STATEMENTS AND COLLECTION

### What the governing documents allow

90. The Bylaws, Art. VII, § 4, as amended by the Second Amendment to the Master Deed, provide a thirty-day grace period. If an owner defaults on an assessment or charge, the owner owes "a late fee in association with said assessment or charge equal to ten (10%) percent of the amount then due and owing," interest at 1.5% per month "against the full amount then due

and owing, including the aforesaid late fee," and "expenses of collection, including attorney's fees incurred by the Board in any effort to collect such unpaid assessment or charge."

91. The late fee is a single charge "in association with" the defaulted assessment or charge. Section 4 does not authorize a new 10% late fee each month on the same unpaid amount, or both a monthly 10% late fee and monthly interest on the same principal. Because the late fee is tied to a particular defaulted assessment or charge, Section 4 also does not authorize recomputing a 10% late fee each month on a running balance made up largely of earlier late fees. The governing documents contain no rule allowing the Association or IMC to apply an owner's payments to late fees, interest, and charges before assessments.

92. Bylaws Art. VII, § 15 requires that the costs of any litigation, including attorney's fees, be assessed to all owners, and provides that "funds from regular assessments shall not be used for any such claim or litigation." (¶58.)

**How Defendants computed late fees**

93. IMC's January 26, 2026 statement for Plaintiff's account shows that, in eight months of 2025 (April through September, November, and December), IMC charged a "Late Fee" pair equal to exactly 10% plus 1.5% of the entire running balance, including late fees charged in earlier months. For example, the November 30, 2025 late fee of $208.58 was 10% of a balance of $2,085.79 that already included $771.15 of earlier late fees, and the March 30, 2025 late fee of $46.50 was 10% of $465.00, a returned $415 payment plus the $50 returned-item fee, so that a late fee was charged on a fee. On January 30, 2026, four days after the attorney referral, IMC posted two entries labeled "Late Fee — Account with Attorney" of $305.58 and $53.08; the second departs from the ratio IMC applied in every other month.

94. IMC charged Plaintiff $1,326.20 in late fees from March through December 2025, and a further $358.66 on January 30, 2026, for a total of $1,684.86. By March 19, 2026,

Defendants' aged-receivables report showed $1,982.31 in late fees against $2,153.00 in assessments (¶67).

95. At the court-ordered February 2026 reconciliation meeting, IMC personnel acknowledged that late fees had been "back posted" to dates before the dates on which any default occurred.

96. IMC's own statements told owners they "have until the last day of the month to make your payment before a 10% + 1.5% late fee is assessed," yet IMC posted Plaintiff's late fees on the 30th of each month, before the end of months with 31 days.

97. On October 11, 2025, Plaintiff disputed the "Pre-Legal" fees in writing to IMC, objecting that there had been "no prior notice, itemization, or opportunity to cure," identifying "duplicate late-fee postings … two on 3/30, 4/30, 6/30, 7/30, and 8/30," stating that the insurance installment had already been paid in May, and asking for a full ledger. IMC did not correct the account or provide an accurate ledger.

98. On information and belief, Defendants applied Plaintiff's payments first to late fees, interest, and other charges rather than to the assessments then due. That practice kept the assessments "unpaid" and generated new late fees each month. On May 4, 2025, Plaintiff paid $1,159 and told IMC in writing that $415 was to cure a returned payment and $744 was for the insurance assessment. On information and belief, Defendants did not apply that payment as Plaintiff directed.

99. On information and belief, IMC computes late fees the same way on the accounts of other Brighton Bay owners and of owners in other communities it manages. The Association, represented by the same counsel, is also pursuing foreclosure against another Brighton Bay owner, Thomas Szymanski, in the same state court (Brighton Bay Horizontal Property Regime v.

Szymanski, No. 2025-CP-07-01467). In his answer and counterclaim filed August 15, 2025, Mr. Szymanski alleged that he tried to pay through the online payment site the Association provided and the system would not accept his payment; that after he reported the problem, the Association claimed to have fixed it, but the system still did not accept his payments; that he was never provided monthly statements or an accurate billing statement; and that the amounts claimed against him contained improper and unsupported items of which he was given no notice and no opportunity to dispute. That case has been referred to the Master-in-Equity. IMC has faced similar complaints for years. In March 2016, a Beaufort County homeowner whose monthly assessments IMC calculated and set sued IMC and the regime it manages, Broad Creek Landing Horizontal Property Regime, in the same court (Vienne v. Broad Creek Landing Horizontal Property Regime and IMC Resort Services, Inc., No. 2016-CP-07-00652). He alleged that IMC and the regime had for a substantial period billed owners amounts in excess of those authorized by the recorded agreement governing the assessments; that they refused for many years to provide any financial documentation supporting their calculations despite owners' requests; and that IMC's practice was an unfair trade practice that had been repeated and continued to affect the public interest. In August 2019, the plaintiff moved to enforce a settlement he said the parties had reached in May 2019, and on September 5, 2019 the parties filed a stipulation dismissing the action with prejudice.

**Statements Defendants say should not be relied upon**

100. In less than a year, Defendants reported more than a dozen different figures for Plaintiff's account, including: $1,913.46 (October 6, 2025); a past-due balance of $2,085.79 (November 19, 2025); $2,500.79 (December 2, 2025); $3,979.84 (February 2, 2026); $4,396.50 (February 2026 statement), while the portal showed $13,020.74 on February 10, 2026; $3,496.84 (sworn by IMC's accounts-receivable manager in her affidavit); $4,837.50 (March 2, 2026);

$5,257.33 (March 23, 2026); $5,698.33 (April 2026); $6,762.19 (May 2, 2026); $7,289.85 (June 2, 2026); $8,377.58 (July 2, 2026); $8,929.47 (August 2, 2026); and $9,497.80 (September 2, 2026). Plaintiff has received no statement since September 2, 2026.

101. IMC's account statements state that the balance shown "should not be used or relied upon," and direct the owner to "log into your account and click on 'My Statement'" to see the "true account history"—the very function that is disabled on Plaintiff's account (¶66). Between its April and May 2026 statements, IMC changed the late-fee description on its statements from "a 10% + 1.5% late fee" to "a 10% late fee … 1.5% will apply monthly thereafter." On October 27, 2025, the Association told all owners it had "discovered an error in the 2025 fees listed on the fees chart." Defendants nonetheless used those balances to threaten legal action, refer the account to an attorney, and demand payment.

**Litigation costs charged to Plaintiff's lawsuit and paid from reserves**

102. Defendants' production in the state action shows a general-ledger account, GL 60126, titled "724 Lawsuit," carrying approximately $22,468.48 in litigation costs through February 28, 2026, including a $6,930 invoice from the Firm (Invoice 906, Check 100128) paid from the Association's insurance reserve account. Defendants have not explained what matter that account covers or why it bears Plaintiff's unit number. If, as its name indicates, it tracks the costs of Plaintiff's lawsuit, Defendants were tracking those costs as Plaintiff's, consistent with their later improper posting of approximately $10,000 of them to her individual owner account (¶¶55–56), although Bylaws Art. VII, § 15 requires such costs to be assessed to all owners and bars paying them from regular funds. On March 2, 2026, Plaintiff asked the Board, through counsel, for an independent audit, restoration of her portal access, suspension of disputed charges, and correction of her account. The same day, counsel responded that "the Board

declines to meet your baseless demands." Defendants' answer in the state action represented that audits were "in progress" and expected in "Q1 2026"; none has been produced.

**The Firm's collection communications**

103. Every email the Firm sends Plaintiff, including its litigation correspondence of October 6 and October 13, 2026, carries the notice: "DEBT COLLECTION: This firm collects debts for mortgage lenders and other creditors. Any information obtained will be used for that purpose." The notice adds that, for a recipient whose debts have been discharged in bankruptcy, the message is "an attempt to enforce a lien."

104. On March 2, 2026, the Firm wrote to Plaintiff that the $10,000 charge "was placed on your account to reflect attorneys' fees expended on this matter by the Association," and sent her an account statement for June 1, 2023 through March 2, 2026. That communication represented attorney's fees for defending Plaintiff's lawsuit as a proper charge to her account, which the governing documents do not allow (¶58).

105. On March 23, 2026, the Firm emailed Plaintiff a demand for $5,257.33, attaching IMC's March 19, 2026 aged-receivables report. The amount demanded included $1,982.31 in late fees computed as alleged in ¶¶93–94, a $42 collection-administration charge, a $58 notary charge, a $100 return-item fee, and a $153.02 "Returned Check" entry that, on Defendants' own ledger, consisted of earlier late fees.

106. On September 16, 2026, the Firm sent Plaintiff a four-page letter responding to her elevator accommodation request, with a fifth page headed "NOTICE REQUIRED BY THE FAIR DEBT COLLECTION PRACTICES ACT" (the "Notice"). The Notice stated, "We are attempting to collect a Debt, and any information obtained will be used for that purpose," and "THIS IS AN ATTEMPT TO COLLECT A DEBT."

107. The Notice stated that "[t]he amount of the Debt is stated in the letter to which this notice is attached" and that "[t]he Debt is described in the letter attached hereto." The attached letter stated no amount and described no debt.

108. The Notice identified "BRIGHTON BAY HORIZONTAL PROPERTY REGIME" as "the Creditor to whom the Debt is owed."

109. The Notice also stated: "This notice should not be construed as a thirty (30) day grace period. Creditor may pursue collection efforts immediately and not wait thirty (30) days."

110. On September 18, 2026, two days after the Notice and well within thirty days of receiving it, Plaintiff disputed the debt in writing to the Firm. She disputed the entire balance of her account, asked for verification and an itemization, and noted that the Notice stated no amount. As of the filing of this Complaint, the Firm has not responded to the dispute, has not stated the amount the Notice was collecting, and has not provided verification or an itemization. The Firm's last stated figure was the $5,257.33 it demanded on March 23, 2026 (¶105), six months before the Notice.

111. Because the Notice stated no amount and described no debt, Plaintiff could not tell what was claimed or what she was being asked to dispute, and still cannot. She spent time and money preparing and sending a dispute without knowing the amount, and suffered anxiety and distress from a collection notice attached to the response to her disability-accommodation request after Defendants had referred her account to an attorney, posted their own attorney's fees to it, and told the state court that the Association had a duty to pursue lien and foreclosure.

112. As a result of the conduct alleged in this Complaint, Plaintiff has paid money that Defendants applied to unauthorized late fees and charges; paid $1,439.07 for off-site storage and incurred travel to it (claimed only under the state-law storage counts, ¶81); paid a locksmith and

paid for help moving property she could not lift; lost the use of the storage unit recorded to her home; lost her kayak, which she was forced to dispose of (¶43); had her ability to sell or refinance her home impaired because Defendants will not provide an estoppel letter or a reliable balance (¶69); spent time and money disputing inflated and unexplained balances; and suffered emotional distress, humiliation, and anxiety over the threatened loss of her home.

## COUNT I

### Failure to Make a Reasonable Accommodation — Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B)

### Against the Association and IMC

113. Plaintiff incorporates paragraphs 1 through 85.

114. Plaintiff is a person with a handicap under 42 U.S.C. § 3602(h). Her impairment substantially limits major life activities, including lifting, bending, and performing manual tasks.

115. Defendants knew of Plaintiff's handicap and the limitations it imposed. They received her physician's note before September 5, 2025, and her written requests of September 4 and September 26, 2025, which were sent to the Board President, the Treasurer, IMC's community manager, and the Association's counsel, and forwarded by IMC to the full Board.

116. Plaintiff requested accommodations in Defendants' rules, policies, practices, and services, including:

(a) a storage solution, whether racks or "other storage solutions," that would let her store her kayak without lifting and moving it beyond her medical restrictions; and

(b) that her medical condition "not [be] used as a basis for further fines," meaning relief from fines and enforcement attributable to her disability while the storage problem was resolved.

117. These accommodations were necessary to afford Plaintiff an equal opportunity to use and enjoy her dwelling, including the storage and parking associated with it. Without them, Plaintiff could comply with the storage rule only by lifting and moving the kayak in violation of her medical restrictions, or by paying fines. Plaintiff's requests addressed that limitation directly. Relief from fines and enforcement would have let the kayak stay where it was, without lifting, until her restrictions eased or storage was arranged. A rack or another assigned storage space, including the storage unit recorded to her own home, would have let the kayak be placed once, with help Plaintiff would arrange, and then left in place, rather than moved repeatedly to satisfy the rule.

118. The accommodations were reasonable. Relief from fines cost Defendants nothing. Storage Unit 7-10, the unit recorded to Plaintiff's own home, was available throughout. When Plaintiff finally identified it on May 5, 2026, it was turned over within days.

119. Defendants refused to make the requested accommodations. They did not record or decide the September 4 request at the September 5 planning session; and on October 1, 2025 refused the request without offering any alternative. Meanwhile they kept the storage fine on her account.

120. The Association and IMC are each liable for its own conduct. The Association decided Plaintiff's requests and controlled the rules, enforcement, and common elements at issue. IMC issued the fine, received and transmitted the requests, communicated the refusal, and continued the enforcement and collection activity. The Association is also responsible for the acts of its agents within the scope of their agency, 24 C.F.R. § 100.7.

121. Defendants acted intentionally, willfully, and with reckless disregard for Plaintiff's federally protected rights. They refused an accommodation they could have provided at no cost,

while the Board President's household occupied the storage unit recorded to Plaintiff's home, and after the President's wife stated that the enforcement against Plaintiff was "to make a point."

122. As a direct result, Plaintiff suffered the injuries described in paragraph 85.

123. Plaintiff is entitled to relief under 42 U.S.C. § 3613(c), including actual damages, punitive damages, and declaratory and injunctive relief, including an order:

(a) prohibiting Defendants from enforcing storage or parking restrictions against Plaintiff without considering a requested accommodation;

(b) requiring the Association to adopt and follow a written reasonable-accommodation policy; and

(c) rescinding the August 19, 2025 storage fine.

**COUNT II**

**Coercion, Intimidation, Threats, Interference, and Retaliation for Exercising Her Own Rights — Fair Housing Act, 42 U.S.C. § 3617; 24 C.F.R. § 100.400**

**Against the Association and IMC**

124. Plaintiff incorporates paragraphs 1 through 112.

125. Section 3617 makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, any right protected by 42 U.S.C. § 3604.

126. Plaintiff engaged in activity protected by the Fair Housing Act, including:

(a) requesting reasonable accommodations for her own disability on September 4 and September 26, 2025;

(b) stating on September 26, 2025 that she would file a fair-housing complaint with HUD;

(c) filing a fair-housing complaint with HUD and SCHAC on March 16, 2026; and

(d) requesting an accommodation for the elevator outage on September 3, 2026.

127. Defendants knew of each protected activity. The accommodation requests and the HUD notice went to the Board President, the Treasurer, IMC's community manager, and the Association's counsel, and were forwarded to the full Board. Defendants were notified of the HUD complaint as respondents.

128. Because of that protected activity, Defendants coerced, intimidated, threatened, and interfered with Plaintiff, including by:

(a) after her requests, refusing to rescind the August 19, 2025 kayak fine, which had been imposed at the second-offense rate without the first-offense notice the recorded Schedule of Fines requires (¶34); keeping that fine on her account and charging late fees on it; and, on October 6, 2025, five days after refusing her accommodation, notifying her that her account was in "Pre-Legal" status and threatening "legal action";

(b) contacting her directly about a "large past due balance" and "potential collection activity" in November 2025 despite counsel's instruction that communications go through him, and later referring her account to an attorney without a Board vote and adding collection and notary charges in January and February 2026;

(c) posting approximately $10,000 of the Association's own attorney's fees to her individual account, where it appeared on the day of summary-judgment hearings in the state action before being removed after the hearings, exposing her home to lien and foreclosure while it remained;

(d) keeping her locked out of the owner portal's account statements after her HUD complaint, charging her late fees throughout, and ignoring her estoppel request, impairing her ability to sell or refinance her home; and

(e) attaching a debt-collection notice to the response to her elevator accommodation request, linking her accommodation request to the debt they claimed;

(f) refusing to let her present her accommodation request to the Board while hearing other owners directly on property matters (¶38); and

(g) artificially inflating the balance they claim from her, by compounding late fees on late fees, back-posting fees, applying her payments to fees first, posting their own attorney's fees and collection charges to her account, and refusing to itemize the result, so as to pressure her to abandon her accommodation requests, her HUD complaint, and her claims.

129. Causation is shown by, among other things:

- the timing of each act after protected activity, including the absence of any enforcement against Plaintiff's kayak for more than a year after the Board's July 31, 2024 deadline, followed by enforcement after her advocacy (¶33);

- Defendants' different treatment of comparable residents, of other delinquent owners, and of a Board officer's use of the cabana (¶37);

- the escalation from no enforcement to fines, "Pre-Legal" status, attorney referral, and a $10,000 charge;

- counsel's threat to seek attorney's fees, followed by the posting of attorney's fees to Plaintiff's account;

- the absence of any authority in the governing documents for that posting;

- the continuation of the lockout and fees after Defendants were notified of the HUD complaint;

- Defendants' failure to answer her estoppel, dispute, extension, and preservation requests (¶71);

- the growth of the claimed balance, much of it fees and charges, after each protected activity (¶76); and

- the September 16, 2026 joining of a collection notice to an accommodation response.

130. Plaintiff's protected activity was at least a motivating factor in each act in ¶128.

131. The Association and IMC are each liable for its own conduct. IMC, through Mr. Bucko, Ms. Beltran, Ms. Phillips, and Mr. Hamilton, sent the "Pre-Legal" notice, imposed the collection charges, made the $10,000 posting and controls the portal. The Association directed, authorized, or ratified these acts, and is responsible for the acts of its agents within the scope of their agency, 24 C.F.R. § 100.7.

132. Defendants acted intentionally, willfully, and with reckless disregard for Plaintiff's federally protected rights.

133. As a direct result, Plaintiff suffered economic loss, including fines, late fees, and collection charges, the cost of paying outside the portal, and the cost of defending against inflated balances. Her ability to sell or refinance her home has been impaired because Defendants will not provide an estoppel letter or a reliable balance (¶69). She also suffered emotional distress, anxiety over the threatened loss of her home, humiliation, and interference with the use and enjoyment of her dwelling.

134. Plaintiff is entitled to relief under 42 U.S.C. § 3613(c), including actual damages, punitive damages, and declaratory and injunctive relief, including an order:

(a) restoring Plaintiff's full access to the owner portal;

(b) rescinding the August 19, 2025 storage fine;

(c) prohibiting further retaliation; and

(d) requiring fair-housing training for the Association's Board and IMC personnel who manage Brighton Bay.

**COUNT III**

**Interference and Retaliation for Aiding a Disabled Neighbor — Fair Housing Act, 42 U.S.C. § 3617; 24 C.F.R. § 100.400(c)**

**Against the Association and IMC**

135. Plaintiff incorporates paragraphs 1 through 77, and paragraphs 128 and 133.

136. Section 3617 makes it unlawful to coerce, intimidate, threaten, or interfere with any person "on account of his having aided or encouraged any other person in the exercise or enjoyment of" any right protected by 42 U.S.C. § 3604.

137. Plaintiff aided and encouraged a disabled resident of the 800 Building in the exercise and enjoyment of her right to equal access to and use of her dwelling, including safe elevator access and exit, at the October 24, 2024 annual meeting and in writing on October 1, 2025 (¶¶23–24).

138. Defendants knew of that advocacy. It took place at a meeting attended by the Board and IMC and was repeated in writing to the Board and IMC.

139. Because of that advocacy, Defendants interfered with, coerced, and threatened Plaintiff, including by designating her account "Pre-Legal" on or about June 30, 2025, eight weeks after confirming it was current, sharply increasing the late fees charged to her account the next month, fining her on August 19, 2025 for kayak storage that had gone unenforced for more

than a year while not fining residents with comparable equipment, "to make a point," and the further acts alleged in ¶128.

140. Plaintiff's advocacy was at least a motivating factor in those acts. The Association and IMC are each liable for its own conduct, and the Association for the acts of its agents, 24 C.F.R. § 100.7. Defendants acted intentionally, willfully, and with reckless disregard for Plaintiff's rights.

141. As a direct result, Plaintiff suffered the injuries described in paragraphs 85 and 133, and is entitled to relief under 42 U.S.C. § 3613(c), including actual and punitive damages and injunctive relief.

**COUNT IV**

**Discrimination in Terms, Conditions, and Privileges Because of Handicap — Fair Housing Act, 42 U.S.C. § 3604(f)(2); 24 C.F.R. § 100.65**

**Against the Association and IMC**

142. Plaintiff incorporates paragraphs 1 through 89, and paragraph 133.

143. Section 3604(f)(2) makes it unlawful to discriminate against any person in the terms, conditions, or privileges of the sale of a dwelling, or in the provision of services or facilities in connection with that dwelling, because of that person's handicap.

144. Defendants discriminated against Plaintiff because of her handicap by:

(a) enforcing storage rules against her while not enforcing them against residents without disabilities;

(b) denying her storage while allowing the Board President's household to occupy the storage unit recorded to her home; and

(c) refusing to make reasonable accommodations, which under 42 U.S.C. § 3604(f)(3)(B) is itself discrimination for purposes of § 3604(f)(2).

145. The Association and IMC are each liable for its own conduct, and the Association is responsible for the acts of its agents within the scope of their agency, 24 C.F.R. § 100.7.

146. Defendants acted intentionally, willfully, and with reckless disregard for Plaintiff's federally protected rights.

147. As a direct result, Plaintiff suffered the economic and non-economic injuries described in paragraphs 85 and 133, and is entitled to relief under 42 U.S.C. § 3613(c).

## COUNT V

### Refusal to Permit a Reasonable Modification (in the Alternative) — Fair Housing Act, 42 U.S.C. § 3604(f)(3)(A)

### Against the Association and IMC

148. Plaintiff incorporates paragraphs 1 through 85.

149. Section 3604(f)(3)(A) makes it discrimination to refuse to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by that person if the modifications may be necessary to afford that person full enjoyment of the premises.

150. In the alternative to Count I, to the extent Plaintiff's request for a kayak rack "or other storage solutions" is treated as a request to modify the premises, the modification was reasonable and necessary to afford Plaintiff full enjoyment of her dwelling and its associated storage and parking, and Plaintiff was willing to bear its cost.

151. Defendants refused it on October 1, 2025 without considering any alternative.

152. As a direct result, Plaintiff suffered the injuries described in paragraph 85, and is entitled to relief under 42 U.S.C. § 3613(c).

## COUNT VI

**False, Deceptive, and Misleading Representations — Fair Debt Collection Practices Act, 15 U.S.C. § 1692e**

**Against Alford Law Firm, LLC**

153. Plaintiff incorporates paragraphs 1 through 112.

154. The assessments and charges the Association claims from Plaintiff are obligations arising from the ownership of her home, incurred primarily for personal, family, or household purposes, and are a "debt" under 15 U.S.C. § 1692a(5). Plaintiff is a "consumer" under § 1692a(3). The Firm is a "debt collector" under § 1692a(6).

155. The Firm used false, deceptive, and misleading representations and means in connection with the collection of the debt, in violation of 15 U.S.C. §§ 1692e, 1692e(2)(A), and 1692e(10), including by:

(a) on March 2, 2026, representing that the Association's attorney's fees for defending Plaintiff's lawsuit were properly "placed on [her] account" (¶104);

(b) on March 23, 2026, demanding $5,257.33, including late fees, collection-administration and notary charges, and a "Returned Check" entry composed of earlier late fees, which misrepresented the character and amount of the debt (¶105); and

(c) on September 16, 2026, sending a notice stating that the amount and description of the debt were in an attached letter that stated no amount and described no debt (¶¶106–107).

156. These representations were material. A consumer told that the creditor's own defense costs were properly charged to her, shown a demand that folded earlier late fees into a "Returned Check" entry, and handed a notice whose stated amount was in a letter that contained none, could not tell how much she actually owed, which charges to dispute, or whether paying

the demand would end the collection. Each would mislead the least sophisticated consumer about the amount and character of the debt and about her rights.

157. As a result, Plaintiff suffered the harm described in ¶111, and is entitled to actual damages, statutory damages of up to $1,000, costs, and any attorney's fees allowed under 15 U.S.C. § 1692k(a).

**COUNT VII**

**Collection of Unauthorized Amounts — Fair Debt Collection Practices Act, 15 U.S.C. § 1692f(1)**

**Against Alford Law Firm, LLC**

158. Plaintiff incorporates paragraphs 1 through 112.

159. Section 1692f(1) prohibits a debt collector from collecting or attempting to collect any amount, including any interest, fee, charge, or expense incidental to the principal obligation, unless the amount is expressly authorized by the agreement creating the debt or permitted by law.

160. On March 23, 2026, the Firm attempted to collect from Plaintiff late fees computed on earlier late fees and charged monthly on the same unpaid amounts, and a "Returned Check" entry composed of earlier late fees (¶¶93–94, 105). It also attempted to collect a $42 "collection-administration" charge and a $58 notary fee (¶54). Bylaws Art. VII, § 4 authorizes one late fee in association with a defaulted assessment or charge, interest, and "expenses of collection, including attorney's fees incurred by the Board." It does not authorize a managing agent's administrative surcharge for turning an account over to an attorney, or a notary fee for an affidavit the managing agent signed against Plaintiff in her own lawsuit. None of those amounts is expressly authorized by the governing documents or permitted by law.

161. As a result, Plaintiff suffered the harm described in paragraphs 111 and 112, and is entitled to relief under 15 U.S.C. § 1692k(a).

## COUNT VIII

### Defective Validation Notice and Overshadowing — Fair Debt Collection Practices Act, 15 U.S.C. § 1692g; 12 C.F.R. § 1006.34

### Against Alford Law Firm, LLC

162. Plaintiff incorporates paragraphs 1 through 112.

163. Within five days after its initial communication with a consumer in connection with the collection of a debt, a debt collector must send a written notice containing, among other things, the amount of the debt and the name of the creditor to whom it is owed. 15 U.S.C. § 1692g(a)(1)–(2); 12 C.F.R. § 1006.34(c). Collection activities and communications during the thirty-day dispute period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt. 15 U.S.C. § 1692g(b).

164. The Firm violated § 1692g(a) because its September 16, 2026 Notice stated no amount of the debt (¶107). In the alternative, if the Firm's March 2 or March 23, 2026 communications were its initial communications in connection with collection of the debt, the Firm violated § 1692g(a) by sending no valid notice within five days after them.

165. The Firm violated § 1692g(b) because the Notice told Plaintiff that the "Creditor may pursue collection efforts immediately and not wait thirty (30) days" (¶109), which overshadowed and contradicted the disclosure of her right to dispute the debt and obtain verification before collection proceeded.

166. As a result, Plaintiff suffered the harm described in ¶111, and is entitled to relief under 15 U.S.C. § 1692k(a).

## COUNT IX

### Breach of the Master Deed and Bylaws (Breach of Contract)

### Against the Association

167. Plaintiff incorporates paragraphs 1 through 112.

168. The Master Deed, its amendments, and the Bylaws are a contract between the Association and each owner, including Plaintiff.

169. The Association breached that contract by:

(a) failing to deliver, and allowing the Board President's household to occupy, Storage Unit 7-10, the limited common element "permanently attached" to Plaintiff's unit (¶¶78–80);

(b) charging late fees and interest in excess of those authorized by Bylaws Art. VII, § 4 (¶¶90–94);

(c) posting the Association's own litigation fees to Plaintiff's individual account, contrary to Bylaws Art. VII, §§ 4 and 15 (¶¶55–58);

(d) charging collection-administration and notary fees that are not "expenses of collection" authorized by § 4; and

(e) fining Plaintiff $25 for a first garage violation, when the recorded Schedule of Fines prescribes only a "Notice" for a first offense (¶34).

170. Plaintiff performed her obligations or was excused from performing them.

171. As a result, Plaintiff suffered damages, including the cost of off-site storage, locksmith and moving costs, loss of use of her storage unit, and amounts paid toward unauthorized charges.

**COUNT X**

**Fraud**

**Against the Association**

172. Plaintiff incorporates paragraphs 1 through 112.

173. On several occasions in 2024 and 2025, Board President Jeff Prekop, acting as President of the Association in answering an owner's question about the availability of storage at Brighton Bay, told Plaintiff that no storage unit was available (¶79).

174. The representation was false. Storage Unit 7-10 was recorded to, and permanently attached to, Plaintiff's own unit, and Mr. Prekop's household was occupying it (¶¶78, 80).

175. The representation was material. Mr. Prekop knew it was false, or made it with reckless disregard of its truth, because his household was using the unit.

176. Mr. Prekop intended that Plaintiff act on the representation by looking elsewhere for storage. Plaintiff did not know it was false, had the right to rely on the statement of the Association's President about the Association's common elements, and did rely on it by continuing to pay for off-site storage and by not seeking her storage unit.

177. As a result, Plaintiff suffered damages, including the cost of off-site storage after the representation and the loss of use of her storage unit. Because the fraud was willful, Plaintiff is entitled to punitive damages.

**COUNT XI**

**Fraudulent Concealment**
**Against the Association**

178. Plaintiff incorporates paragraphs 1 through 112.

179. The Association had a duty to disclose to Plaintiff that Storage Unit 7-10 was assigned to her unit, and a duty not to conceal that the Board President's household was occupying it. That duty arose because the Association keeps the records of limited common elements and administers their use under the Master Deed (¶78); because its President, who knew his own household was occupying a storage unit for which it held no recorded right, answered Plaintiff's direct questions about storage (¶79); and because, having chosen to speak,

the Association could not give a partial and misleading answer, telling Plaintiff that no storage was available while withholding the fact that a storage unit was recorded to her own home.

180. The Association concealed those facts from Plaintiff from the time she bought Unit 724 until May 5, 2026, including while it refused her request for a storage solution and while its President received her accommodation requests (¶¶42, 79–80).

181. Plaintiff did not know the concealed facts and could not reasonably have discovered them earlier. As a result, she suffered damages, and is entitled to actual and punitive damages.

**COUNT XII**

**Negligent Misrepresentation**
**Against the Association**

182. Plaintiff incorporates paragraphs 1 through 112.

183. In the alternative to Count X, the Association, through its President, negligently represented to Plaintiff that no storage was available (¶79). The Association owed Plaintiff a duty of care in communicating the truth about the common elements it administers, and the speaker had a pecuniary interest in the statement because his household was using the unit.

184. The Association breached that duty by failing to exercise due care. Plaintiff justifiably relied on the representation and suffered pecuniary loss as a result, including the cost of off-site storage.

**COUNT XIII**

**South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10 et seq.**
**Against IMC**

185. Plaintiff incorporates paragraphs 1 through 112.

186. IMC engages in trade or commerce in South Carolina by selling property-management, billing, and collection services to condominium regimes and owners' associations.

187. IMC committed unfair and deceptive acts and practices, including charging a new 10% late fee each month on running balances that include earlier late fees; back-posting late fees to dates before any default; issuing account statements and balances that it tells owners "should not be used or relied upon" while directing them to a statement function it has disabled on Plaintiff's account; posting the Association's own litigation fees to an owner's individual account; and refusing to itemize the balances it demands.

188. These acts have an adverse impact on the public interest and are capable of repetition. On information and belief, IMC uses the same computation on other owners' accounts at Brighton Bay and at other communities it manages. Another Brighton Bay owner has alleged that IMC's online payment system would not accept his payments and that he was never given accurate statements, and an owner at another community IMC manages sued IMC in 2016 alleging that it billed owners amounts the governing documents did not authorize and refused for years to document its calculations (¶99).

189. Plaintiff suffered an ascertainable loss of money or property as a result, including payments applied to unauthorized charges. The violations were willful or knowing, including because IMC had notice of similar complaints for years (¶99). Plaintiff is entitled to actual damages, treble damages, and attorney's fees under S.C. Code Ann. § 39-5-140.

**COUNT XIV**

**Unjust Enrichment (in the Alternative)**
**Against the Association and IMC**

190. Plaintiff incorporates paragraphs 1 through 112.

191. In the alternative to her contract claims, Plaintiff conferred a benefit on the Association and IMC by paying money that they applied to late fees and charges not authorized by the governing documents.

192. Defendants realized and retained those benefits under circumstances that make it inequitable for them to keep them without paying their value to Plaintiff.

**COUNT XV**

**Declaratory and Injunctive Relief, 28 U.S.C. §§ 2201–2202**
**Against the Association and IMC**

193. Plaintiff incorporates paragraphs 1 through 112.

194. An actual controversy exists between Plaintiff and the Association concerning their rights and obligations under the governing documents. IMC is named because it computes and posts the charges, applies the payments, and maintains the account at issue, so that the declarations and injunction bind it in carrying out the Association's charges.

195. Plaintiff is entitled to a declaration that:

(a) Storage Unit 7-10 is a limited common element appurtenant to Unit 724, and the right to use it belongs exclusively to the owner of Unit 724;

(b) Bylaws Art. VII, § 4 authorizes one late fee of ten percent in association with each defaulted assessment or charge, plus interest as stated, and does not authorize late fees computed on earlier late fees or a new 10% late fee each month on the same unpaid amount;

(c) the Association may not charge its costs of defending litigation brought by an owner to that owner's individual account, Bylaws Art. VII, §§ 4 and 15; and

(d) the governing documents do not authorize applying an owner's payments to late fees, interest, and charges before assessments, or contrary to the owner's written direction.

196. Plaintiff is entitled to an injunction requiring Defendants to compute charges on her account in conformity with that declaration going forward, to restore her full access to her

account statements, and to refrain from charging her individually for the Association's litigation costs.

## PRAYER FOR RELIEF

Plaintiff respectfully asks the Court to enter judgment in her favor and against each Defendant on the counts pleaded against it, jointly and severally to the extent permitted by law, and to:

A. Declare that Defendants' conduct violated 42 U.S.C. §§ 3604(f)(2), 3604(f)(3)(A), 3604(f)(3)(B), and 3617; that the Firm violated 15 U.S.C. §§ 1692e, 1692f(1), and 1692g; and the declarations requested in Count XV;

B. Permanently enjoin the Association and IMC from:

(1) enforcing storage, parking, or other rules against Plaintiff without considering requested accommodations;

(2) retaliating against Plaintiff for exercising her fair-housing rights;

(3) charging Plaintiff individually for the Association's litigation costs, or charging late fees on late fees; and

(4) recording a lien against, or seeking to foreclose on, Unit 724 in retaliation for Plaintiff's protected activity, or on the basis of fines, fees, attorney's fees, or charges not authorized by the governing documents;

C. Order the Association and IMC to:

(1) restore Plaintiff's full access to the owner payment portal and her account statements;

(2) rescind the August 19, 2025 storage fine;

(3) adopt and follow a written reasonable-accommodation policy;

(4) provide fair-housing training to the Board and to IMC personnel who manage Brighton Bay; and

(5) provide Plaintiff a complete, itemized history of all charges posted to and payments applied on her account;

D. Award compensatory damages, including for emotional distress, in an amount to be determined by the jury;

E. Award statutory damages against the Firm under 15 U.S.C. § 1692k(a)(2)(A);

F. Award treble damages against IMC under S.C. Code Ann. § 39-5-140;

G. Award punitive damages against the Association and IMC;

H. Award costs, and any attorney's fees permitted by law;

I. Award pre-judgment and post-judgment interest; and

J. Grant such other relief as the Court deems just.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

______________________________

Michelle Alexandra Ruby, Plaintiff, pro se
80 Paddle Boat Lane, Unit 724
Hilton Head Island, SC 29928
(202) 570-6746 · alexrubywriter@gmail.com

Date: 10/19/26